UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

PAMELA Y. JELKS,

                    Plaintiff,

-vs-                                                          Case No.  6:04-cv-766-Orl-JGG

JO ANNE B. BARNHART,
Commissioner of Social Security,

                    Defendant.

_____

# MEMORANDUM OF DECISION

Plaintiff Pamela Y. Jelks ["Jelks"] appeals to the district court from a final decision of the Commissioner of Social Security [the "Commissioner"] denying her application for a period of disability, disability insurance benefits and supplemental security income benefits.  *See* Docket No. 1 (complaint).  For the reasons set forth below, the Commissioner's decision is **AFFIRMED**.

## I.     PROCEDURAL HISTORY

On July 26, 2001, Jelks filed claims for disability insurance benefits and supplemental security income, claiming disability as of March 17, 2001. R. 41-43.  On August 5, 2003, the Honorable James R. Ciaravino, Administrative Law Judge ["ALJ"], held a hearing on Jelks' claim in Orlando, Florida. Jelks testified, and her non-attorney representative, Janet White, appeared with her.  R. 244-72.

On October 28, 2003, the ALJ ruled that Jelks was not entitled to benefits.  R. 11-19. Following a review of the medical and other record evidence, the ALJ found that Jelks had severe impairments, but did not have an impairment or combination of impairments that met or equaled a listed impairment. R. 18-19, Findings 3-4.  The ALJ also found that Jelks' testimony regarding her

limitations was not totally credible.  R. 19, Finding 5.  Further, the ALJ determined that Jelks retained the RFC to perform a full range of light work.[1]  R. 19, Finding 7.  Accordingly, the ALJ determined that Jelks could return to her past relevant work, and therefore concluded that Jelks was not disabled. R. 19, Findings 8, 9.

Jelks timely appealed the ALJ's decision to the Appeals Council.  R. 7.  Finding no error or abuse of discretion, the Appeals Council denied review on March 18, 2004.  R. 4-6.  On May 20, 2004, Jelks timely appealed the Appeals Council's decision to the United States District Court for the Middle District of Florida.  Docket No. 1.  On November 19, 2004, Jelks filed a memorandum of law in support of her appeal of the denial of review.  Docket No. 16.  On January 18, 2005, the Commissioner filed a memorandum in support of her decision that Jelks was not disabled.  Docket No. 18.  The appeal is ripe for determination.

## II.   THE PARTIES' POSITIONS

Jelks assigns three errors to the Commissioner's decision: 1.) failing to fully develop the record regarding Jelks' cardiovascular problems; 2.) improperly evaluating Jelks' subjective complaints of pain; and 3.) failing to accord substantial weight to Jelks' treating physician.   Pl.'s Brief at 10-21. The Commissioner responds that her decision was supported by substantial evidence and was decided by proper legal standards.  The Commissioner asserts that: 1.) the ALJ was not required to order a consultative examination; 2.) substantial evidence did not support Jelks' allegations of disabling pain; 3.) the ALJ properly accorded weight among Jelks' physicians.  Def.'s Brief at 3-18.

---

[1]Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  If someone can do light work, the Commissioner determines that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.  20 C.F.R. § 404.1567(b).

III.   **THE STANDARD OF REVIEW**

A.   **Affirmance**

The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405 (g).  Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

**B.**       **Reversal and Remand**

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause. 42 U.S.C. § 405 (g)(Sentence Four). The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir. 1994); *accord, Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). This Court may reverse the decision of the Commissioner, and order an award of disability benefits, where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord, Bowen v. Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984).

The district court may remand a case to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405 (g); under sentence six of 42 U.S.C. § 405 (g); or under both sentences. *Jackson v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996). To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. *Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); *accord Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. *Falcon v. Heckler*, 732 F.2d 872, 829 - 30  (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work) (treating psychologist acknowledged that claimant had improved in response to treatment and could work in a supportive, non-competitive, tailor-made work environment).   On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence.  *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (ALJ should consider on remand the need for orthopedic evaluation).   After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction.  *Jackson*, 99 F.3d at 1089, 1095.

In contrast, sentence six of 42 U.S.C. § 405 (g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405 (g).

To remand under sentence six, the claimant must establish:  1.) that there is new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level.  *See Jackson*, 99 F.3d at 1090 - 92; *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988); *Smith v. Bowen*, 792 F.2d 1547, 1550 (11th Cir.

1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *see also Keeton v. Dept. of Health and Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994).

A sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant. *Jackson*, 99 F.3d at 1095. With a sentence-six remand, the parties must return to the district court after remand to filemodified findings of fact. *Jackson*, 99 F.3d at 1095. The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings. *Id*.

## IV. THE LAW

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416 (i), 423 (d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his or her previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423 (d)(2); 20 C.F.R. §§ 404.1505 - 404.1511.

### A. Treating Physicians

Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise. *See Lewis v.* Callahan, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991); *Sabo v. Commissioner of Social Security*, 955 F.Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527 (d). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not

-6-

inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527 (d)(2).  The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).  When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1.) length of the treatment relationship and the frequency of examination; 2.) the nature and extent of the treatment relationship; 3.) the medical evidence supporting the opinion; 4.) consistency with the record a whole; 5.) specialization in the medical issues at issue; 6.) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527 (d).  However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir.1984); *see also* 20 C.F.R. § 404.1527 (d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. § 404.1527 (e).   The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed

impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because that ultimate determination is the providence of the Commissioner.  20 C.F.R. § 404.1527 (e).

### B.   Developing the Record

The ALJ has a duty to fully and fairly develop the record.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988); *Cowart v. Schweiker*, 662 F.2d 731, 735 - 36 (11th Cir. 1981).  The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right.  *See* 42 U.S.C.§ 406; *Cowart*, 662 F.2d at 734.  The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel.  *See Cowart*, 662 F.2d at 735 - 36.  However, where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty.  *See Jelks v. Shalala*, 44 F.3d 931, 934 - 35 (11th Cir. 1995), *citing Smith v. Schweiker*, 677 F.2d 826, 829 (11th Cir. 1982). This special duty requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts" and to be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited."  *Cowart*, 662 F.2d at 735 (citations omitted).

### C.   Medical Tests and Examinations

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled.  20 C.F.R. § 416.917; *see also Conley v. Bowmen*, 781 F.2d 143, 146 (8th Cir. 1986).  In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a

consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision. *Holladay v. Bowen*, 848 F.2d 1206, 1209 (11th Cir. 1988); *Reeves v. Heckler*, 734 F.2d 519, 522 n. 1 (11th Cir. 1984) (failure to order such an evaluation may be reversible error). Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary. 20 C.F.R. § 416.917 (1998).

### D. The Five Step Evaluation

The ALJ must follow five steps in evaluating a claim of disability. *See* 20 C.F.R. §§ 404.1520, 416.920. First, if a claimant is working at a substantial gainful activity, she is not disabled. 20 C.F.R. § 404.1520 (b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit his or her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520 (©). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled. 20 C.F.R. § 404.1520 (d). Fourth, if a claimant's impairments do not prevent him or her from doing past relevant work, she is not disabled. 20 C.F.R. § 404.1520 (e). Fifth, if a claimant's impairments (considering his or her residual functional capacity, age, education, and past work) prevent him or her from doing other work that exists in the national economy, then claimant is disabled. 20 C.F.R. § 404.1520 (f).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process. 42 U.S.C. § 423 (d)(2)(B). The ALJ must evaluate a disability claimant as a whole person, and not

in the abstract as having several hypothetical and isolated illnesses. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993). Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled. *See id.*, 985 F.2d at 534.

The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991). The claimant must prove disability on or before the last day of his or her insured status for the purposes of disability benefits. *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979); 42 U.S.C. §§ 416 (i)(3); 423(a), ©). If a claimant becomes disabled after the claimant has lost insured status, his or her claim for disability benefits must be denied despite the disability. *See, e. g., Kirkland v. Weinberger*, 480 F.2d 46 (5th Cir. 1973); *Chance v. Califano*, 574 F.2d 274 (5th Cir. 1978).

### E.    Other Work

Once the ALJ finds that a claimant cannot return to his or her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy. *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995). In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant. *Foote*, 67 F.3d at 1558; *Allen v. Sullivan*, 880 F.2d 1200, 1201 (11th Cir. 1989). This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines [the "grids"]. *Foote,* 67 F.3d at 1558. Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant

non-exertional factors.  20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00 (e); *Foote*, 67 F.3d at 1559; *Heckler v. Campbell*, 461 U.S. 458 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements).

Exclusive reliance is not appropriate "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills." *Walker v. Bowen*, 826 F.2d 996, 1002-03 (11th Cir. 1987).  In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert.  *Foote*, 67 F.3d at 1559; *Chester v. Bowen*, 792 F.2d 129, 132 (11th Cir. 1986); *see also MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986) (when non-exertional limitations are alleged, the preferred method of demonstrating that the claimant can perform specific work is through the testimony of a vocational expert).  It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy.  *See Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th Cir. 1989); *Ferguson v. Schweiker*, 641 F.2d 243, 248 (5th Cir. 1981).  In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations.  *Foote*, 67 F.3d at 1559.

  1. **Pain**

Pain is a non-exertional impairment.  *Foote*, 67 F.3d at 1559; 826 F.2d at 1003.  Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other

evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged.  42 U.S.C. § 423 (d)(5)(A).  The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.  20 C.F.R. § 404.1528.  In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote,* 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  Pain alone can be disabling, even when its existence is unsupported by objective evidence, *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself, conclusive of disability.  42 U.S.C. § 423 (d)(5)(A).

## 2.    **Credibility**

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Foote,* 67 F.3d at 1561-62*; Jones v. Department of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence).  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record. *See Hale v. Bowman,* 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986).  As a matter of law, the failure to articulate the reasons for discrediting

subjective pain testimony requires that the testimony be accepted as true. *Foote,* 67 F.3d at 1561-62*; Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case. *See Smallwood v. Schweiker*, 681 F.2d 1349, 1352 (11th Cir. 1982).  If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater*, 67 F.3d at 1562 (quoting *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir.1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

V.     **APPLICATION AND ANALYSIS**

A.     **The Facts**

Born on April 6, 1954, Jelks was forty-nine years old at the time of the ALJ's decision.[2] R. 41. Jelks has a high-school education, and her past relevant work experience includes work as a security guard and housekeeper.  R. 73, 258.  Jelks claims an inability to work beginning March 17, 2001.  R. 41.

On March 17, 2001 Jelks went to the ER after sustaining injuries from a fall.  She complained of pain in the head, arm, neck, back, pelvis and left leg.  A CT scan of the brain and an x-rays of the thoracic spine were negative.  X-rays of the cervical spine revealed normal alignment and degenerative changes at C4-5 to L5-6 and 6-7 with large anterior osteophytes, but no fracture or dislocation.  The

---

[2]She is now fifty-one years old.

diagnoses were cervical sprain, lumbar sprain, left ankle sprain, and contusion of the left elbow.  R. 82-90.

On April 17, 2001, Jelks went to Joseph N. Saba, M.D., for a neurological evaluation.  She complained of headaches, significant low back pain with radiation to the toes, severe pain in the tail bone and low back, and neck pain radiating into the left middle finger.  Valsalva and neck turning aggravated the pain.  Examination revealed weakness of the left extensor hallucis longus and extensor digitorum brevis.  There was moderate weakness of the left tricep, moderate sensory loss in the left ulnar nerve distribution, and positive Tinel's at the elbow.  Deep tendon reflexes were 3+ equal except for the left tricep jerk which was unobtainable.  Jelks' range of motion of the neck and shoulders was normal, but low back range of motion could not be examined because of pain.  Straight let raising was reduced to 20 degrees.  Dr. Saba noted that Jelks' pain was appropriate and tended to support other clinical findings.

The assessment was post-concussive syndrome manifested by post-traumatic headache, insomnia, irritability, poor concentration, depression, anhedonia, crying spells, severe fatigue, difficulty concentrating and remembering, injury to the neck with high likelihood of left C7 radiculopathy and disc herniation or disc spur complex at the C6-C7 level, probable post-traumatic left ulnar neuropathy at the elbow, severe injury to the low back and coccyx with high likelihood of left L5 radiculopathy with compression of the left L5 nerve root and iatrogenic-hypothyroidism.  Dr. Saba concluded that the findings were extremely suggestive of disc herniation or disc spur complex at C6-7 and in the low back at L4-5 or L5-S1 with the presence of left L5 radiculopathy.  Dr. Saba

-14-

recommended continued conservative treatment, including neck and back exercises, and advised Jelks to walk one mile daily, and to gradually increase up to three miles. R. 94-97.

On May 14, 2001, Jelks returned to Dr. Saba, who noted there was not much improvement except for her concussion and depression, which were significantly improved. Dr. Saba noted that an MRI confirmed a disc spur at C6-C7 and C5-C6, compression of the spinal cord, but no myelopathy. An MRI of the lower back showed a disc spur complex at the left L5-S1 level with compression of the left L5 nerve root. The final impression was pre-existing degenerative disc disease of the cervical and spine (which Dr. Saba opined was not unusual for a forty-seven year old), soft disc herniation at C6-C7 and L5-S1, pre-existing hard disc herniation and post-traumatic soft disc herniation. Dr. Saba noted that the post-traumatic disc protrusion herniations by themselves were not very dramatic, but were exacerbated by preexisting degenerative disc disease.

On that same day, Dr. Saba performed an EMG of the cervical paraspinal muscles on the left side showed fibrillation. Nerve conduction velocity of the left upper extremity showed left ulnar neuropathy at the elbow. The assessments were post-concussion syndrome, improving; injury to the neck, slight improvement; mild left ulnar neuropathy at the elbow, iatrogenic hypothyroidism, and nicotine dependence. Jelks' long term prognosis was poor, and she would not be able to avoid neck and back surgery. Dr. Saba advised Jelks to continue therapy and to take the minimum amount of pain medication necessary. R. 91-93.

On May 30, 2001, Richard Leedy, D.O., completed a Request for Medical Verification form. He opined that Jelks was 100% disabled and was precluded from work due to injuries to the spine at

-15-

C6-7, and L4-5 and L5-S1, with radiculopathy, intermittent muscle spasm, and pain.  He also noted that rehabilitation would improve her physical outcome.  R. 225.

On June 27, 2001, Richard B. Stewart, M.D., summarized Jelks' physical therapy progress. Jelks received therapy on 20 sessions from March 26, 2001, through June 14, 2001.  On her initial visit, examination showed limited range of motion and strength of the cervical spine, lower back, and left ankle.  The diagnosis was cervical, lumbar, and ankle sprain, and contusion of the left elbow. During her period of treatment, Jelk's improvement was evident in decreased tenderness, increased range of motion of the affected areas, improved cervical/lumbar strain, and decreased pain to palpatation.  On June 19, 2001, Jelks was discharged from therapy.  At that time, examination of the neck and back revealed unimproved strain.  The final impressions were resolving cervical sprain and resolving lumbar sprain.  No medications or orthopedic appliances were prescribed upon discharge. Regarding Jelks' future medical care, Dr. Stewart advised conservative treatment, including periodic evaluations, medication, and brief periods of therapy as needed.  R. 98-102.

On August 29, 2001, Jelks returned to Dr. Leedy for complaints of pain in her cervical/lumbar spine and headaches.  Her cervical bending was reduced to 15 degrees forward, back, and sides. Lumbar bending was reduced to 30 degrees forward, 10 degrees back and sides.  The assessment was radiculitis, chronic sprain and chronic headaches.  Treatment comprised medication.  R. 205.  Jelks returned to Dr. Leedy on September 25, 2001.  Examination showed no change.  The diagnosis was radiculopathy and chronic lumbar/cervical sprain.  R. 204.

On October 11, 2001, Rosimeri Pereira Clements, Psy.D., P.A., performed a consultative psychological examination.  Jelks arrived with a cane.  The diagnosis was mood disorder due to

-16-

chronic bodily pain and spasm with depressive feature, spinal injury at C6-7, L4-5 and L5-S1, left sided pain and headaches, psychosocial stressors of custody of grandson, health problems and death of child, and a GAF of 60. Dr. Clements concluded that Jelks' prognosis was guarded, and advised Jelks to seek a neurological evaluation and mental health services. R. 110-12.

On November 13, 2001, Timothy D. Foster, Ph.D., completed a Psychiatric Review Technique form. The diagnosis was a non-severe affective disorder, namely, depression due to pain. The only functional limitation identified was mild difficulties in maintaining social functioning. Dr. Foster noted that Jelks had no history of mental treatment, and he concluded that any functional limitations were physical, not mental, and that she had no severe mental functional limitations. R. 114-27.

On November 18, 2001, state agency physician M. de la Cerna, M.D., performed a Physical Residual Functional Capacity. He determined that Jelks could lift 20 pounds occasionally, 10 pounds frequently, sit/stand/walk for 6 hours, and had unlimited pushing/pulling ability. In all other respects, Jelks had no functional limitations. Dr. de la Cerna concluded that Jelks' symptoms were credible and consistent. R. 128-35.

On November 20, 2001, Jelks returned to Dr. Leedy for complaints of pain from the shoulder to the elbow, and constant hand pain. The diagnosis was radiculitis and chronic cervical and lumbar sprain. R. 202-03. On December 20, 2001, Jelks returned to Dr. Leedy for complaints of chronic spasm and radiculitis. R. 200.

On December 30, 2001, Jelks went to the ER for complaints of back and neck pain. Examination revealed tenderness and muscle spasm. X-rays of the cervical spine revealed

degenerative disc disease, spondylosis, and hypertrophic spurring from C4-5 through C6-7, but no fracture or spondylolisthesis . The impression was degenerative changes. X-rays of the thoracic spine revealed mild hypertrophic spurring and degenerative changes, but no fracture, spondylolisthesis, or bony lesions. The impression was mild degenerative changes. The final impressions were acute myofascial strain in the cervical and dorsal area, and degenerative disc disease of the cervical and thoracic spine. R. 136-41.

On January 3, 2002, Lata Bansal, M.D., performed a neurological evaluation. Jelks complained of numbness and weakness on her left side, and she limped and walked with a cane. Examination showed 5/5 motor strength on the right, but poor left hand grip. She had some "give way" weakness on the left. Sensory examination showed decreased sensation on the left side. There was a bony spur at C6-7 level. Jelks was noted to be very depressed. R. 168. The final assessment was left sided weakness and numbness in the back and giveaway weakness in her left upper extremity. Dr. Bansal opined that Jelks' left side weakness and right nasolabial flattening were suggestive of a brainstem stroke, and she stated that Jelks' symptoms could be due to depression or to secondary gain. Suggested treatment comprised physical therapy and medication. R. 167-70.

Jelks returned to Dr. Leedy on January 11, 2002. Examination showed decreased range of motion, grip strength and LLE muscle strength. Her reflexes were 1/4 right, 0/4 left and patellar 0/4 bilaterally. The diagnosis was cerebrovascular accident with hemiparesis, cervical radiculopathy and hypothyroidism. The history notes indicated that Jelks suffered a second cervical strain on January 1, 2002. R. 199.

-18-

On January 18, 2002, Jelks underwent an MRI of the spine, which showed increased abnormal signal in the vertebral bodies of C6-7, and disc space narrowing and osteophytes at C5-6 and C6-7. There was a relative stenosis at C4-5, C5-6 and C6-7. There was a large bony bar which showed significant narrowing at C5-6. The impression was extensive degenerative disc disease and relative spinal stenosis from C3-4 through C5-6. R. 222.

On February 8, 2002, David R. Cox, Ph.D., completed a Psychiatric Review Technique form. The diagnosis was a non-severe affective disorder (mood disorder due to chronic pain). The only functional limitation was mild difficulty in maintaining concentration, persistence, or pace. R. 143-56.

On February 27, 2002, Jelks told Dr. Leedy that she had no improvement in her weakness and pain. R. 196. On March 12, 2002, Peter Oostwouder, M.D., performed nerve conduction studies. The impression was normal. R. 166. On March 27, 2002, Jelks had a follow-up visit for hypertension. The assessment was hypothyroidism and cervical radiculopathy. R. 194. On April 3, 2002, Dr. Bansal completed a questionnaire for the Office of Disability Determinations. She stated that Jelks was never prescribed a cane and was able to walk without it. R. 165.

On April 12, 2002, state agency physician David Kitay, M.D., performed a physical residual functional capacity assessment. He determined that Jelks could lift 20 pounds occasionally, 10 pounds frequently, sit/stand/walk for 6 hours, and had unlimited pushing/pulling ability. Due to pain and decreased range of motion, Jelks could occasionally climb ramp/stairs, stoop, and crouch. In all other respects, Jelks had no functional limitations. Dr. Kitay concluded that Jelks had medically determinable credible and consistent symptoms. R. 159-64.

German Montoya, M.D., a neurologist, saw Jelks on April 26, 2002, for assessment of

-19-

her neck and low back problems.  Jelks walked with a cane.  Her gait was very antalgic.  Jelks had give-away weakness of the left arm and left leg, but was able to use the left arm reasonably well.  There was 100% restriction in range of motion of the cervical and lumbar spine.  Radiographs of the cervical spine revealed advanced degenerative changes at C5-6, at L5-S1 in the lumbar area, and minimal spondylosis of the thoracic spine.  The impression was cervical spondylosis and degenerative lumbar disc disease.  Dr. Montoya completed a request for medical verification form and noted that Jelks' diagnosis was cervical spondylosis and lumbar discitis.  He further noted that Jelks was 100% disabled as of that date.  R. 178-80.

On May 8, 2002, Jelks was diagnosed with backache and cervical radiculopathy.  R. 192.  On August 1, 2002, a cervical spine x-ray revealed degenerative changes at C4-5, C5-6 and C6-7.  A lumbar spine x-ray revealed degenerative disc changes at L5-S1.  A thoracic spine x-ray showed thoracic spondylosis.  R. 175-77.

Jelks returned to Dr. Montoya on November 20, 2002.  She reported continuing severe pain in the lower back, right lower extremity and neck.  Jelks decided to proceed with surgery.  Jelks had decreased range of motion of the lumbar spine.  Straight leg raising was positive on the right side at 45 degrees. The range of motion of the cervical spine was moderately limited, but Jelks had good strength in the upper extremities.  R. 171-72.

On April 1, 2003, Jelks had complaints of a three-day headache pain, and reported some slurred speech with drooling. Jelks had sharp pains in her head three to four times per day, left arm numbness, swollen neck, and had sluggish reflexes.  Jelks was alert and oriented, had no problem

following commands, and her speech was intact but slow. A CT scan of the brain was unremarkable. R. 186.

On July 11, 2003, Jelks went to the ER with complaints of suddenly developed retrosternal chest pain. The impression was atypical chest pain, chest wall tenderness, chronic back pain and hypothyroidism. It was noted that Jelks had been admitted in October 2002, with a similar complaint. However, a stress test performed at that time was normal, and an echocardiogram showed normal left ventricular function, with an ejection fraction around 65%. R. 226-27.

On that same day, the ER physician referred Jelks to John C. Chow, M.D., who performed a consultative examination for recurrent chest pain. A stress test was submaximal, but there was no evidence of myocardial ischemia. The lungs were clear, and the heart had a regular rate and rhythm. The impression was recurrent chest pain. Dr. Chow noted that Jelks had risk factors for coronary artery disease: her age, hypertension, and cigarette smoking. R. 229-31.

### B.    The Analysis

#### 1.    The ALJ Was Not Required to Order a Consultative Examination Regarding Jelks' Cardiovascular Symptoms.

Jelks asserts that the ALJ failed to fully develop the record concerning missing portions of a report by Dr. Chow. The Court disagrees. Notwithstanding the results of Dr. Chow's report, the record contained sufficient evidence regarding Jelks' impairments for the ALJ to render his decision. Jelks bears the ultimate burden of proving disability, but she failed to furnish medical and other evidence sufficient to show functional limitations due to cardiovascular symptoms. The record does not establish that a cardiovascular examination was necessary to enable the ALJ to render an informed decision.

-21-

At the administrative hearing, Janet White ["White"], Jelks' representative, stated that on July 11, 2003, Jelks had been hospitalized for chest pains and underwent a stress test. However, White stated that she did not have the results of the stress test. The ALJ responded he wanted to see the report, and he would retain the record open for twenty days to allow Jelks to submit the report. R. 250-51. However, White then requested the ALJ to "make a Decision [sic] based on the record as it stands right now, without waiting for that." R. 270. Although the ALJ again insisted that Jelks submit the report, Jelks never submitted it. The ALJ did not order a consultative examination.

Notwithstanding the results of the stress test, the record contained sufficient evidence regarding Jelks' cardiovascular symptoms for the ALJ to render an informed decision. The evidence shows no severe cardiovascular symptoms. In fact, the record barely contains *any* references to treatment for hypertension and cardiovascular symptoms. Jelks was hospitalized in October 2002 for chest pain. However, a stress test and ECG were normal. In addition, there is no evidence that the disputed stress test of July 2003 was ever performed, and Jelks has submitted no evidence of further symptoms or treatment for cardiovascular problems after July 2003. Finally, Jelks forgets — conveniently — that she herself requested the ALJ to disregard the results of the test and failed to submit it despite the ALJ's insistence. It is disingenuous for Jelks to now allege that the ALJ failed to develop the record.

### 2. The ALJ Properly Evaluated Jelks' Subjective Complaints.

Next, Jelks submits that the ALJ failed to properly evaluate her subjective complaints of pain. Jelks is wrong. The evidence shows no underlying medical condition of such a severity that can be reasonably expected to give rise to the alleged pain.

-22-

The evidence establishes that Jelks has chronic back pain and reduced range of motion of the cervical and lumbar spine due to degenerative disc disease, but the evidence does not support Jelks' allegations of totally disabling pain. From March 2001 through May 2002, Jelks sought treatment for back pain on more than fifteen occasions. During this period, radiographs consistently showed degenerative disc disease, and Jelks' treating physicians consistently found reduced range of motion of the spine. However, treatment during this period was conservative, comprising therapy and medication. In April 2001, Dr. Saba, a treating physician, suspected disc herniations, but advised Jelks to continue conservative treatment and to walk for three miles daily. Although an MRI performed in May 2001 showed post-traumatic soft disc herniations and pre-existing hard disc herniations, no subsequent radiographs confirm disc herniations. In addition, Dr. Saba noted that the pre-existing hard disc herniation was degenerative and was not unusual for a person of Jelks' age, and he advised Jelks to continue therapy and to take the minimum amount of pain medication necessary. He also noted that Jelks' long-term prognosis was poor and that she could not avoid future surgery. But Jelks never had surgery. In November 2001 and April 2002, two state agency physicians opined that Jelks could perform light work.

From May 2002 through July 2003, Jelks received only sporadic treatment for back pain. In November 2002, Dr. Montoya, a treating physician, advised Jelks to undergo surgery on the lumbar and cervical spine. Although Jelks sought authorization for surgery, she never underwent the surgery. At the hearing, Jelks explained that she was unable to have surgery because she had a stroke around March or April 2003. R. 249, 265. However, a subsequent CT scan of the brain revealed no abnormalities.

-23-

Jelks' activities of daily living are also inconsistent with Jelks' allegations of totally disabling pain.  In October 2002,  Jelks reported to Dr. Clemens that her social life was somewhat active and that she could initiate and maintain friendships.  R. 111.  Jelks also stated that she is able to cook, perform household chores, make the bed, do laundry, take care of her grandson, watch television, visit relatives, drive, shop, and shop for groceries.  R. 52-55, 57-58, 111, 173.

In sum, medical and other evidence shows no existence of an underlying medical condition of such a severity that can be reasonably expected to give rise to the alleged pain.  The Court notes that the evidence of disc herniations, together with the clinical impressions of two treating physicians advising surgery, creates a suspicion of a medical condition more severe than found by the ALJ.  However, substantial evidence must do more than merely create a suspicion of the existence of a fact.  Even if this Court would have reached a different result as a finder of fact, the result would not change, because substantial evidence supports the Commissioner's decision.[3]

### 3.    The ALJ Properly Accorded Weight Among Jelks' Physicians.

Finally, Jelks contends the ALJ erroneously accorded greater weight to the opinions of  Dr. de la Cerna, a state agency physician, rather than to Jelks' treating physicians.  Specifically, Jelks argues that the ALJ ignored the opinions of at least four of Jelks' treating physicians who opined that Jelks was 100% disabled.  This argument is meritless.  The ALJ accorded substantial weight to Dr. de la Cerna's opinion that Jelks could perform light work.  The ALJ also observed that no treating or examining physician placed any limitations on Jelks' ability to do work-related activities for a

---

[3]Jelks also argues that the ALJ erroneously discredited Jelks' testimony.  In a torrential, shotgun pleading approach, Jelks recites a catalog of about 20 specific errors that the ALJ allegedly committed in discrediting her testimony. Pltf.'s Brief at 13-18.  Having carefully considered each of these allegations, the Court concludes that the ALJ properly discredited Jelks' testimony.

continuous period of twelve months.  Treating physicians Drs. Montoya, Iyer, Leedy, and Turk each completed a "Request for Medical Verification" questionnaire, which asks "Does [claimant's] illness/injury totally (100% disability) prevent all participation at this time?"  In response, the physicians selected the "Yes" choice.  However, a physician's response to a questionnaire requesting medical verification does not provide any supporting clinical or laboratory findings.  Indeed, in their clinical impressions, none of the above physicians ever determined that Jelks was disabled.  Moreover, the questionnaire specifically inquires about the claimant's injuries only at the time of completion of the questionnaire, but not for a continuous twelve month period.  Accordingly, the ALJ did not err in according weight among Jelks' physicians.

## VI.     CONCLUSION

For the reasons stated above, the decision of the Commissioner should be **AFFIRMED**.  The Clerk should enter a judgment.

**DONE and ORDERED** this 20th day of July, 2005.

JAMES G. GLAZEBROOK
UNITED STATES MAGISTRATE JUDGE

The Court Requests that the Clerk
Mail or Deliver Copies of this Order to
All Counsel of Record and *Pro Se* Litigants,
and to:

Mary Ann Sloan, Chief Counsel
Dennis R.  Williams, Deputy Chief Counsel
Paul Jones, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia        30303-8920

Susan Roark Waldron
Assistant United States Attorney
400 N. Tampa St., Suite 3200
Tampa, FL            33602

The Honorable James R. Ciaravino
Administrative Law Judge
c/o Social Security Administration
Office of Hearings and Appeals
Suite 300, Glenridge Building
3505 Lake Lynda Drive
Orlando, FL            32817